Your Honor, this case presents a unique opportunity for this court to address. We have a failure to warn case where all expert testimony withstood double challenges, expert reports and depositions. The bulkhead here was not being used for cargo securement, was it? The bulkhead was, the load itself was not designed to... Was it used for cargo securement? No. In terms of the Federal Motor Carrier Safety Association, which talks about the load being in contact with the bulkhead to have it count as cargo securement, that the Federal Motor Carrier Safety Inspector worked to inspect. However, Your Honor, I'd like to... And you can respond to that. You can amplify that. If that's the case, then why is a DOT-rated or non-DOT-rated bulkhead relevant? For a variety of reasons, Your Honor. And let me speak to that. First and foremost, having a load slightly away, about a foot and a half, according to my witness testimony from the bulkheaded issue, is commonplace. That is acknowledged even by Appellee Wabash's own expert. That, however, does not, does not, in fact, even the New Jersey Commercial Driver's License Manual speaks to it, does not diminish the expectation that one is going to get protection from a solid steel wall if a load shifts forward. Well, that's not my understanding from reading the briefs. My understanding from reading the briefs is that if you have a moving load that can come up against the bulkhead, the bulkhead is no protection no matter what the strength of the bulkhead is. That you have to have the load secured up against the bulkhead with the bulkhead part of the security to keep it from being a moving load. To address that question directly, Your Honor, again, for cargo securement, it does not count as cargo securement if the load is not in contact with the bulkhead. The New Jersey Commercial Driver's License Manual, though, specifically states... Yeah, but that's, no, that's, I'm talking about the experts who were saying... You cannot construct a bulkhead that will withstand the dynamic force that we have here. That is correct, Your Honor, absolutely. You may now respond to that as well. But in terms of the expectation that a bulkhead will protect you even if the load is not in contact with it, that is borne out specifically in the New Jersey Commercial Driver's License Manual that shows a diagram on the same page. But that's completely contrary to any engineering concept of what will protect you, right? That's correct, but, Mr. Vigel... If it's a picture of something that won't protect you, how can you say that someone would be justified in thinking it would protect you? If it's put up on the New Jersey Commercial Driver's License Manual and the person is not an engineer, Mr. Vigel was not an engineer, Your Honor. This is about his expectation of protection. It's also about proximate cause. So if it's the case that no bulkhead would have protected him, how can you say a lack of warning would have made a difference? Because even if there had been a warning, there's nothing that would have changed. He would have been hit with those steel beams, no matter what steel was between him and the steel beams. I'm glad you asked the question that way, Your Honor. Failure to warn cases do not presume that everything else remains equal. The warning your expert proposed didn't even mention the necessity of securing the load to the bulkhead and didn't mention the problem that even if the load wasn't secured to the bulkhead, that this barrier would offer no protection. That was not part of the warning you proposed that admitted to evidence, right? I'll take both of those questions separately if I could, Your Honor. Having a load in contact with this bulkhead would still fail Federal Motor Carrier Safety Association regulations because this bulkhead is not rated to withstand any load. Okay, but having it in contact with any bulkhead? Well, the warning is only for this bulkheaded issue, Your Honor. And if theoretical bulkhead, I'm sorry, I don't understand that particular question. Why would a warning that this bulkhead would not provide protection be of any use when it didn't give any indication of how protection could be accomplished? Well, again, when we have a warning on a bulkhead, bulkheads and trailers can be used in a variety of different facets. Trailers, for example, are not used to transport one specific type of load. Are there warnings on bulkheads? Yes, there are. Okay, what do they say? We actually, this is cited in a brief at length about there are certain bulkheads out there, as well as cab shields, which are slightly different, that talk about static load strength requirements. That means it's right up against it. Not just those, but also cab protectors, which are mounted actually on tractors and not in contact with loads, Your Honor. But that's a different thing. Slightly different. Isn't the warning that you really wanted is that the bulkhead does not offer cab protection from a shifting load? No, but it offers no protection at all. If I could read specifically the warning that was proposed by Dr. Vigilini, because I believe the second point of the warning speaks exactly to what Your Honor is speaking about, about protection. Well, does the defendant here give any inkling that this bulkhead was actually going to protect? That's the point, that there is no warning whatsoever. All you have is what it looks like, which is a solid steel wall attached with four vertical steel supports to a trailer that has a gross vehicle weight rating of 100,000 pounds. Doesn't that get you to a major problem? Because Mr. Rugemeier testified that the lack of a warning would have caused Mr. Gangell to reasonably believe that the bulkhead would protect him from a shifting load within the trailer's gross vehicle weight restriction. And the gross vehicle weight restriction by the manufacturer was 100,000 pounds, but it looks like under federal and state law it was only 80,000 pounds. And what you have on here was 103,000 pounds. So he's 23,000 pounds over the weight limit under federal and New Jersey law. And if you go to the axle weight, it's supposed to be 20,000 pounds per axle. The federal and state is 17,000. One axle at 27,700, the other at 28,500. If I could break that down, Ron, 103,000 pounds is the weight of the tractor and the trailer and the load combined. The weight of the trailer, which has a 100,000-pound GVWR and the load, is well underneath 100,000 pounds. The restriction of 80,000 pounds involves a permit, whether or not you can transport more than 80,000 pounds with a permit or not. It has nothing to do with vehicle failure. So this weight, as conceded by Wabash's own experts, was within the GVWR of the trailer. If he had put seven beams on instead of 11, what would the weight have been? Of the trailer and, well, I believe each—sorry, arithmetic is not my finest suit, Your Honor— but I believe each beam is 6,900 pounds each, so it would be around— About 27,600. Or so, plus the weight of the trailer itself, still way under 100,000 pounds, as it is with all 11 beams on the trailer itself. That's what Mr. Rubinier is talking about. There's a GVWR placard on the trailer, put aside the issue of the tractor, that says 100,000 pounds. How actually that load is distributed on the axles was never weighed as the vehicle was traveling down the road. It was only weighed after, by the police, after the pilings had been pulled back. They were not in their original position. But getting back to whether any bulkhead could have taken this shot, which is what the district court was looking at in terms of causation, that is, for purposes of a failure to warn claim, irrelevant. And I can give some examples. In the Pearlman case, a surgical tool was used by a surgeon. Surgeons are obviously meticulous in terms of inspecting equipment and using it. In that case, the cord was frayed. And a warning had also been provided with that product, saying, do not use if there is a frayed cord. The inquiry for that cord was not whether or not any cord would have deteriorated in such fashion, or whether or not any other cord would have been better protected, but whether or not a warning was adequately conveyed to the surgeon. And a summary judgment occurred. Let me ask you something, Mr. Sherry. The district court said that you had agreed that the heating presumption had been rebutted. Is that accurate? What I specifically said in the oral argument was, at trial, I have no doubt whatsoever that Wabash will provide evidence that will defeat the heating presumption. Once that happens, and the Pearlman court makes this absolutely clear, absolutely clear, the only benefit the defendant receives is relief from a directed verdict without summary judgment. If you agree, and it sounds like you did agree, that the heating presumption, based on the evidence that they had available to them and told the court about, would rebut the heating presumption, then according to the Sharp case, which you rely on heavily, that means you had to have conceded that your client's fiancée, the decedent here, was an habitual ignorer of warnings, right? Because Sharp says it's not enough to rebut the heating presumption just to show occasional ignoring of safety warnings. You have to have something that rises to the level of habit, right? As I couched it, Your Honor, at time of trial. They would provide that type of evidence at trial. All right. Except that that's true. I mean, if you acknowledge that that's the evidence that's coming down the pike and that at that point there's not going to be a directed verdict, the way Sharp seems to read and the way that Kaufman seems to read is that at that juncture you're at equipoise, and it's not enough for you to say you still bear a burden of preponderance, right? A burden of persuasion with the jury. Sure. A burden of persuasion by a preponderance of the evidence. You've got to show it's more likely than not that the warning would have made a difference. It would have changed the behavior of the decedent, correct? Yes, and it would be to the jury to evaluate that. Now, don't you have to, in order to get past summary judgment, if you're at equipoise, don't you have to do something to show it would have been different? Don't you have to have some evidence to show he would have behaved differently? Yes, and I can demonstrate that, Your Honor. I wish you would. Remember, as I said at the beginning of my comments, all challenge deposition testimony and all expert reports are in. They all pass down according to the court. Here's what Mr. Rouganier stated at his deposition. Question. What do you think Deceit Gangel would have done differently if there had been no bulkhead in front of the trial? That's what this is. Non-DOT bulkhead, non-assistant. Answer. I believe he would have used some change across the front. Now, what does Wabash's expert say? Wabash is an expert, which is part of the universe in a federal court case. What does Wabash's expert say of change we used across the front? There were also several usable chains on the subject truck when the accident occurred. If these chains had been utilized in addition to the straps that were utilized, the load would not have moved forward. Even in the overloaded condition, the load would not have moved if the chains had been utilized. That is exactly what we're talking about here. Question. A warning, the one proposed by Dr. Vigilante, accepted by the court as meeting all necessary Daubert criteria, would have conveyed to Mr. Gangel, you received no protection, and he would have done what Mr. Rouganier or Tindy would have done. What was that second point of the warning that you thought spoke to this and would have changed behavior? Let me read the warning precisely to the court. If it's easier, what we can do is have you look at it. No, I thought I brought it up with me. Again, is it such a – That's okay. You're a part of the case. But specifically, it provides no protection whatsoever, believe me, in the event of a load shift. I will quote it to you verbatim, but again, it states that specifically, that you will receive no protection. Okay. I see that my time has expired, but I will come back on rebuttal. That's fine. Thank you very much. Mr. Dietrich. Good morning, Your Honors. My name is Gerard Dietrich, and I will be arguing on behalf of Wabash National, which is the affiliate here this morning. I'd like to begin by addressing the plaintiff's argument that the proximate cause of that failure to warn case must always be decided by a jury. And this Court's opinion in the court authority really disposes of that. That same argument was made in that case. In this case, just to start off, from the type of question one would have at the very beginning, didn't he have a duty to warn Mr. Gangell that the bulkhead did not offer cab protection? I mean, usually, at least when I would see a bulkhead, I would think, hey, that's to protect the guy or gal in the cab. And in this case, it's pretty clear it's not going to protect anyone if there's a dynamic force here. And so wouldn't that be the type of warning that should have been given? You might think that because you're not a commercial driver and because you're not someone who's licensed as a motor carrier and therefore you don't have a deep understanding of the Federal Motor Carrier Safety Regulations and trucking practices. Mr. Dietrich, they've got an expert witness that says commercial drivers wouldn't have a dramatically different understanding than the one Judge Ambrose just mentioned. I mean, isn't that the nature of Mr. Rueggemer's testimony, that your average driver thinks you're going to get some protection out of this piece of steel between you and your load? One of the problems, of course, with Mr. Rueggemer is that he had very little experience with bulkheads. He never used one. That's right. That's a valid issue. The court let him in. And you can kick the you-know-what out of him on the stand if there's a jury trial and he's up there about all that. But the fact is, it passed Albert Muster, and you had evidence that a commercial driver would be thinking, I'm getting some protection here, right? I don't think so, because the Federal Motor Carrier Safety Regulations specifically tell you that that bulkhead has to have a strength rating only if you have a load up against it. There's no question that you've got opposing evidence. The question I'm trying to ask you is, you said no commercial driver would understand that there's protection there. At least I understood you to be making a remark like that in response to Judge Ambo's question. And my question to you is, how can you say that when they've got an expert who's prepared to take the stand at trial and say commercial drivers are thinking that that's some bit of protection for them? Okay, I should back up here a little bit and say that it does provide some protection. So they're thinking that it provides some protection is okay. I mean, Mr. Harris, who was one of the experts for the plaintiff, talked about the strength that this would have. It's a static load rating, so you really shouldn't rely on it when there's a dynamic force.  And that's a good point. Let me ask you this. Let's assume he had strapped this down just right. I realize there's a question as to whether he claimed that he didn't strap it down well. Let's assume he had strapped it down just right. And during the course, something happened. One of the straps didn't work well. There was somehow something that he didn't know about. And the beams got loose. And they went through the bulkhead and caused injury or death. Isn't there, in that hypothetical, at least the basis that the manufacturer here of the bulkhead should give a warning that this bulkhead will not give you protection against, in that case, a dynamic force because they would have been strapped down so that they weren't necessarily static? Let's say they're 18 inches away, right? I understand. I want to go back to my last thing. I think I can answer that question. It is not correct, I think, that Mr. Rubenberg says that he would have had an expectation that this bulkhead would have stopped 70,000 pounds once it got going. He doesn't say that. He says it would have offered a bit of protection. And so when you have 70,000 pounds of steel that's going, there's no evidence from anyone. No one says, I would have expected that that bulkhead or any bulkhead was going to stop that. What are motor carriers, what are drivers, commercial drivers who drive these heavy trucks? What are they required, if anything, to know about the Federal Motor Carrier Safety Regulations? They're supposed to know basically everything about them. They have these little handbooks that they carry around in their glove compartments so that they can look at them and they can know them. They're required to have them? I'm sorry? Are they required to have them? They're not required to have the handbook, but they are required to know the regulations. And do the regulations cover this concept of dynamic loads and static loads and what protection a bulkhead will provide? The only regulation that pertains to this bulkhead is the one that's at 393.114. And that regulation tells you that there's a strength that you can use it only if the load is up against it. It specifically tells you only if the load is up against it. So once you are away from that, then there should be no expectation that it's going to save you. And in fact, no one says there is. And Mr. Gangell was licensed so that this was one of the things he was expected to know in his capacity as a licensed commercial driver? Yes, both him and Pearson as a licensed motor carrier. If the judge or attorney has questions, I'll come back to them. Let me ask you, the district court said, this is page 24 of the opinion, the court agrees with the defendant that even if plaintiff heeded the proposed warning in this case, the unfortunate outcome remains unchanged. There is no evidence in the record that if a DOT-rated bulkhead was on the trailer that day, everything else remained the same. The bulkhead would stop the steel from penetrating the cap. And the question I've got for you, and it's something that appears in the briefing, there's a bit of a battle in this in the briefing, is, is it right for the court, can the court say, assuming everything else remains the same, is it proper in a failure to warn case to assume that everything else would have been the same? Or is that an improper thing for the judge to do? Do you understand my question? I do. I think that what the judge is saying, if they had loaded it the same way, the same distance, with the same amount of steel, I'm sure that's what the judge is saying. And I guess what I'm asking is, is that a proper assumption to make when you're making the proximate cause determination? Because isn't the point of the warning that everything else won't remain the same? The warning might change behavior. Well, here the warning was, and I want to disagree with what was said by counsel here, that all the experts were standing. They weren't all standing after the doubtful opinions. Mr. Harris was gone. Mr. Middleton was gone. Unless we have your, we're passed through doubt. But they can't, the warning says ensure CAD protection is DOT rated. That's what they were told to do. And what happened is their experts who were going to say that would have made a difference fell. They didn't make it past their depositions. They in fact had to admit that they had been wrong. And that DOT rated bulkhead, DOT rated protection would not have made a difference. I apologize because I'm not asking this well. Okay. I think it's true that the expert they withdrew, Mr. Harris, indicated, yeah, there's nothing you could put between this man and that moving steel that would have saved them if everything had been the way it was. But I understand the argument from your opponent to be, if there had been a warning, things wouldn't have been the way they were. He would have strapped it down differently. He would have used the chains. He would have done something different had he understood this is not offering me protection. I've got to do something different here. The warning's telling me to do something different. And I got Mr. Rugemeier telling the jury, you know, in the face of a warning like that, this is how drivers would behave. They'd behave differently in this way. What's wrong with that analysis from the plaintiff in critiquing the district court's opinion? There's a couple of things wrong with it. The first thing is, of course, that the warning doesn't say that, and although the judge decided that the expert testimony was going to come in with regard to Daubert, that was Rugemeier and Vigilante, the Heller v. Shaw case, which is a case that he's cited, and if you read his opinion, it ties in with it. That case explains that even if the expert testimony is admitted, some reach agent might be warned if a party has still failed to present sufficient evidence to get to the jury. Well, it says even if expert testimony meets the Daubert standard, but it's shaky, or it's appropriate where admissible expert testimony provides only a scintilla of support. And those are words that Judge Rodriguez used in his opinion. Those are things that he found here. So your argument in response is, even with Rugemeier's testimony, a rational jury couldn't accept that drivers would change their behavior in the face of a warning? Yes, in part because the warning doesn't tell them to do what they're saying, and he had warnings here that did. For example, he had laws and regulations that told him to do other warnings that told him to do. Understood. You've got plenty of evidence to show that the decedent, while he may have been a wonderful fellow and a good fiancé to Ms. Durkin, was not a fellow who regularly heeded warnings. You can certainly make that argument. And then you have Rugemeier who's conceding that he still had to follow the regulations. He still had to strap it down. And if he straps it down in accordance with the regulations, it doesn't occur. This incident does not occur. What Rugemeier only says, the only thing he says is that, he says maybe he would have done something more than he was already required to do, which is to sufficiently tie it down. He might have done something beyond that. But that doesn't get me to proximate cause either, because that's unnecessary. When you say that doesn't get to proximate cause, that's the challenge I'm having. Because if he'd done something different, and incidentally, the district court said there's no evidence that cross-strapping would have made a difference, but there is evidence, right? There's the evidence from Rugemeier, and then there's the state trooper's evidence that indicated something would be different. I mean, if there's evidence there that would have, you can poo-poo it, but it's evidence, right? No, the state trooper absolutely does not. His testimony on that wouldn't be admissible. He says, I'm not an accident reconstruction expert, I'm not a dynamics expert. If he had no expertise, he would say, well, I think this, but that's not competent evidence that would come in. That's not something to be considered here. Well, is that something that the district court decided would not come in? That's an argument for you to make if there's a trial, right? There's deposition testimony in the record from their expert and from a state trooper saying cross-strapping would have made a difference here, the load wouldn't have shifted, and the expert saying had there been a warning, the load would have been secured differently. That's my opinion. So if those are the pieces of evidence, how is that beneath, how is that outside the realm of rationality for a jury looking at to say, you know what? We think things would have been different. We think the accident wouldn't have occurred this way and his life might have been spared. I believe Judge Rodriguez understood that that state trooper's testimony in regard to that point was not coming in. Let me ask you, the Federal Motor Carrier Safety Regulations, do they say anything about how to strap a load down, how to control a load? Absolutely. And this is information that Mr. Gangell should have as a licensed commercial driver, should have had in his head in dealing with any load on the truck? Yes. He had section 393.110, which explains that for the length, you have to have two, if you have a cargo on there for the first 10 feet, you have to have two straps, and then for each 10 feet after that, you have to have another strap, which meant that here, because he was at 50 feet and two and a quarter inches with regard to the steel, that he had to have seven straps. And the state trooper talks about that. He says it in his report. It's not up against the bulkhead. If it's up against a bulkhead, that is a rated bulkhead that meets the requirements of 393.114, then he could have used six straps, but he otherwise had to have seven. But there's also the weight issue, which is at 393.106. He also has to have a certain amount of straps with regard to the weight, and with regard to that, it has to be half. The working load limits on those straps have to be half the total cargo that he has. Here's the total cargo he has. It's 74,500. If you just look at the steel beams, there's other things on the back. It's 72,600, and he's not close to being at half that weight. So as a licensed motor carrier driver, he disregarded the information he had on how to strap the load down safely in the first place. Yes. If he had strapped it down in that manner, would it have stayed as a static load? If he had strapped it down in accordance with the rules, as he was supposed to have used a sufficient number of straps, didn't need to do more, just needed to do what the federal regulations required, the steel would not have gone anywhere. Let's assume for the moment this comes back to the hypothetical. Let's assume he did that. He was properly weighted, and he had properly strapped, and yet there was something that happened with one of the straps or whatever, and the beams became dislodged, and there was a dynamic force going forward through no fault of Mr. Gangell. Is there not at the least a duty to state that a bulkhead will give you no protection? I'm not sure really why. If I said that, anyway, it would be too late. Well, we get it in the morning. We get it in the morning that says that it doesn't provide you any protection. In fact, there are lots of tractor trailers out there that don't have any cab protection. I mean, this is needed cab protection, but they don't have a bulkhead, and they don't have a headache rack. Neither. On the tractor and trailer, they could carry this exact same load. It would be absolutely clear to them. And what case do you cite for that? What case do I cite? In other words, that there's no need to say that a bulkhead would not offer cab protection. The only case I could find that you cited was the Ward v. Arm & Hammer case, which has nothing to do with this matter, first of all. I'm not citing a case. I'm just giving you an example of that. So in that situation, there's no warning. I think you'd probably agree there's no warning necessary. They have to strap it down. Still, if the straps get loose, it can come through. But this is the case where it isn't just a cab and the load. It's a cab, the bulkhead, and a load. And assume under my – what I'm thinking about is the next case, just so you understand where I'm heading. Right. I want to know, if we rule in your favor, what are the consequences on the next case? And so what happens in my hypothetical? Everything's done perfectly, but something goes wrong with one of the straps through no fault of Mr. Gangell. Is there a duty on behalf of the defendant here to say that, hey, folks, a bulkhead will give you no protection? Whether it's rated or not? Whether it's rated or not. Correct. So I guess with regard to that, I want to tell you, first of all, the warnings that are out there are on rated bulkheads, not on unrated bulkheads. Because once you give someone – Whether it's rated or not. I understand what you're talking about. I just want you to understand that once you tell someone it has a rating, that starts to give them an idea that it has strength, so you need to tell them it won't with regard to the dynamic. We don't tell them this bulkhead has any strength. But I do think partially you have to see what the circumstances of that case are. I don't know how I can rule beside every case. I just told you. The example – this is the next case. The next case is Mr. Gangell put the right number of beams on. The vehicle is not overweighted. It's fully within federal and state law. It's strapped according to every model one can have. Something goes wrong with one of the straps, and it goes forward, and the bulkhead doesn't protect the driver. In that case, is there an obligation on behalf of the manufacturer to say, hey, just so you all know, these bulkheads don't give any protection or warning? I just – I'm going to give you my position. I think you have to have – You've got to think about that. You've got to have it up against the cab and say that. Because that's the only time. The bulkhead is only used for cargo securement if it's up against it. So if you have something on there, they're using it for cargo securement, and they think that they're allowed to, but they're not. And I think maybe there's arguably a warning with regard to that. Hey, you shouldn't use this for cargo securement. But they're not used for cab protection. You don't call it a cab protector. May I ask a question about something raised in your opponent's reply brief? The plaintiff here speaks at some length about the Facendo case, Facendo v. SMS Comcast, and looking at that case, it seems to say that even when the heeding presumption has been rebutted, a trial judge is still supposed to tell a jury that it can, if it wants to, draw inferences from the existence of a warning, that you can infer from the existence of the warning that behavior would change, even though you don't have to presume it. Have I read the case right? I think that Sharp specifically addresses Facendo, and it says, The Sharp court says, We read Facendo to require the judge to view the evidence and instruct the jury on inferences that may nonetheless be drawn from the evidence. Notwithstanding the abrogation of the presumption, the presumption still goes away. Part of the confusion is that there are different types of presumptions you have. There are natural or logical presumptions, where one fact logically flows from another fact, and so you can find an inference. But this isn't that type of presumption. It's a public policy presumption. And it's not a presumption. It's a presumption which is rebutted, and then the Facendo court appears to be saying straight up, Yeah, it's rebutted. You're not going to presume the fact. But in the Facendo case, the trial judge had said, Hey, they rebutted the presumption. I'm not going to instruct them about inferences that could be drawn from the existence of the warning that people might behave it, which seems kind of logical to me, but the New Jersey Appellate Division of the Superior Court says, No, you give that instruction. You have to give that instruction, and you have to give that instruction, because even though the presumption doesn't exist, they don't have to assume that the person would heed it. They can choose to infer that the existence of the warning would lead to something different if they want to. I think you have to look at the Sharp case that had no date. They specifically address Facendo in a different way than you are, and they're basically saying that, What is Sharp saying that is different from that? I can say in some other cases for that you're on, that we're not in our brief, that I think that are important, but they start talking about Rule 301 and what happens with regard to those cases, and it's an issue that's been addressed by the Third Circuit, not in regard to the heeding presumption, but with regard to New Jersey Rule of Evidence 301 and its federal counterpart, 301, and they explain it. So in the McKenna case, for example, which is at 32F3rd, 820, and specifically at pages 829 to 830, they discuss the New Jersey Evidence Rule and its federal counterpart, and they explain that presumption disappears any inference that can be drawn from basic facts remained. You still have to look at what facts, what evidence have they put in? Not just the presumption. Presumption's gone. And what the Sharp case is saying, while you have some facts that you really were talking about in there that makes you get... Where did Sharp say that? Where did Sharp say... Sharp in 118... Point out the language where Sharp says Facendo was talking about facts other than inferring from the warning. It says, in talking about Facendo, then they go on to say, we know, however, that the Coffman Court made it quite clear that the heeding presumption is not based upon natural inferences, but rather as a matter of public policy. Thus, any inferences deserving of special instruction would necessarily have to be based upon the evidence in a given case as opposed to those that undergird the heeding presumption itself. That's at Head Note 18. Okay. I got you. The McKenna case also cites the commentary to the New Jersey Rule, which basically says the same thing. There's also the McKenna case, which is at 458 F. 3rd, 281, pages 287 to 288, where they cite to McKenna, and they again talk about the fact that if you're looking at the Federal Rule 301, which is treated the same way, the presumption disappeared. It's the Hurstein bubble. Okay. And they cite to both Weinstein and Wigmore to explain it. There's also New Jersey Supreme Court that talks about Rule 301, which is all versus Ken, at 678 A. 2nd, 1073, specifically at page 1081, it says the presumption disappeared. These cases were all set in your brief, were they not? They were not. And I'm going to tell you, because what happens is... Have you filed a 28-J letter then? I have not, but I would like to. Okay. We'll do that. Why don't you sum up in about... We'll give you one more minute. I want to just talk about the capacity of the trailer. I think you get this. Even if it's within the GBWR of the trailer, it's not within the capacity of the trailer because it exceeds the axles. And here, I don't care how they would put the steel on it, it had to exceed the axles because there's not enough... The capacities of all the axles combined on a tractor-trailer aren't great enough to be more than the total of the weight of the tractor-trailer and load. Angel did not see the CDL manual, so when they start talking about that diagram, which they're trying to take inferences from, that doesn't give him any expectations because he never saw it. Well, he should have been familiar with it. No. He shouldn't have been familiar with it because he got his license in Massachusetts, and the Massachusetts CDL manual doesn't have the diagram that they're referencing. But he was familiar with the Federal Motor Carrier Safety Regs, or he should have been. He should have been, absolutely. And the Federal Motor Carrier Safety Administration has gone out of its way to, over a series of years, point out the fact that those structures up front will not save you once things get moving. Is that knowledge required in order to get your specialized license, that you're familiar with these safety regs? To get your specialized license, you have to pass the test. So if you have enough knowledge to pass the test, you get your license. You still are required to know the regulations. Are the regulations part of the test? They're referenced in it. The parts of the test... are referred to different regs. Are based on it, yes. So if you're studying for the test, you've got to know the regs. Yes. Okay. Thank you very much. Thank you. Mr. Sherry. Thank you. To pick up where we left off in terms of what the warning specifically states, the proposed warning in that old Daubert criteria, point two of the warning states, this bulkhead does not provide cab protection or cargo secure, making very clear to drivers, this will not protect you and do not use it for cargo secure. I'm sorry. That is from what? That is Dr. Vigilante's proposed warning. It specifically states that on the warning. The first point on the warning is... Dr. Vigilante was their expert. Dr. Vigilante is our expert. Vigilante's expertise was in what? Human factors and warnings. Okay. That's what I thought. As I understand it, Dr. Vigilante, when asked, said, in effect, you can't say he wouldn't have behaved differently, not that he would have behaved differently in the face of the warning, right? Well, because Mr. Vigilante is dead. Okay. So we can't ask him specifically that. The issue is, and what Dr. Vigilante stated during his deposition is, when you provide him with this warning, he's then aware of the dangers of that bulkhead and he takes different steps, as Mr. Wigandier testified to. I was very concerned. I didn't want this to be missed, that counsel stated that the way to secure this load, and the inference being so that it would not have moved, is in that particular manual over there. It's not. In fact, Cooper Pacinac, who cited him for not having the lateral strapping, specifically testified in his deposition that even Mr. Ganshow used all the lateral strapping, I believe this goes to your hypothetical, Judge Ambrose, that load is still moving. Well, now, Mr. DeTrook said it was regulation 393.110. Is that in the book there? Certainly. That does not apply to frontal chain cross-strapping, Your Honor. It doesn't state that at all in that regulation. Well, it talks about cross-strapping, and Mr. DeTrook said that if the load had been strapped in compliance with that regulation, it wouldn't have moved. The regulation, Mr. DeTrook explained it to you, is lateral strapping over the top of the load. Yeah, right. That is not stopping this load, Your Honor. It is the frontal cross-chain X-bracing. And I also wanted to make this clear. One of the experts that's saying that if you use that X cross-bracing in front, that load is not going to move, that is Wabash's expert. That is Mr. Kemp. I'm sorry if I didn't make that clear during my opening remarks. No, you did. He specifically made that statement. And that goes, obviously, to the guts of causation. If I can use another case for an example, and everything else remaining the same, because I think that's very important. There's the Levy v. Yamaha case. Instead of doing that with the very limited time you have, why don't you respond to the response about Facendo, okay? You rely on Facendo in your reply brief. Mr. DeTrook has stood up here and said, Facendo has been distinguished away 10 days from Sunday. You got any response to that? Sure. Just going directly from what the Facendo court states. Well, Facendo has labor authority undermining it. I'm not sure quoting from the Facendo case itself is going to help. Do you have anything to respond? I'll discuss the Sharpe case, because I believe Mr. DeTrook indicated that the Sharpe case somehow stood for the proposition that Facendo has been outmoded, for lack of a better word. The Sharpe case, as the school is very familiar with, deals with an alleged failure to warrant on a canvas roof on a vehicle that was being operated by a plaintiff who had been drinking, was not wearing a seat belt, and fell asleep. That case was not tossed on summary judgment. It went to the jury. Yeah, but we don't know whether there was even a motion for summary judgment, right? Fair enough. But that particular case, we know what the jury did. The jury found that it should have provided a warrant, but there was no causation. It was the jury that made that determination. It's ultimately going to be made to – that ultimately should always be the situation when you have experts that survive Daubert challenges in failure to warrant cases. All the cases make that completely clear. I couldn't find any case involving failure to warrant that went under the New Jersey Products Liability Act, which everyone agrees governs this case, where experts are allowed in, meet Daubert criteria, but nevertheless the case is disposed on in summary judgment. Instead, every one of those cases, the Ward v. Armand Hammer case, the court specifically found no duty to warrant. Here, the court, as you all saw when you came in, did find that there was an arguable duty to warrant on the part of Wabash. All the other cases, the Saw case, the case where the person was wearing flammable clothing, there was either no expert support provided or the experts were struck. As a result, there was no evidence that could go to the jury. That's not the situation here. Here you have a person very familiar with commercial transportation safety, meets all Daubert criteria, let in. The same is true with Dr. Vangeliani in terms of human factors and warnings. He's let in. That's evidence now. That's evidence for the jury to consider and weigh, along with everything else. Well, now, as a district judge, I don't recall having qualified an expert witness that I was going to automatically then let in anything the expert witness had to say. Well, what he specifically was evaluating, Your Honor, was everything they said that was challenged in terms of their expert reports and everything they said at their deposition that was challenged by Wabash. And all of Wabash's arguments in those regards were rejected. So that's the only thing this Court has before us. Agreed. Not part of Wabash. They can say what they want in front of the jury. Then I wash my hands of the matter. But everything that Wabash predicated its notion for summary judgment on, your experts don't have the ability to say what they say. They don't have a factual foundation to say what they say. Their methodology is incorrect. The Court considered it and rejected it. Rejected it completely. As a result of testimony I provided to you in the brief, as well as talked about today, as to what Mr. Gangell would have done differently if he had been presented with a warning insofar as securing the load differently, all of which is evidence at this point, according to the Court, that rejected Wabash's notion to deal with that. As a licensed driver, Gangell had a duty to know the Federal Motor Carrier Safety Regulations, right? Yes. But that does not, however, just like somebody taking a jet ski out on rough water has a duty to know what the weather is going to be like before they start driving. It makes you appreciate the danger a lot more if you are familiar with the safety regs or the problems with jet skiing or whatever. I'm glad you say that, Your Honor, because, again, as I hope is very clear in the briefs, this particular bulkhead was not, there are not any bulkheads out there that provide no strength. No strength. Cannot be relied on for anything. That wasn't known even by Wabash's own Federal Motor Carrier Safety expert, Ronald Ashby, who's been doing this for decades. He said he didn't even know that these types of bulkheads even existed before this case. Of course, he's very familiar with these types of boats. So this really is a hidden danger. In fact, Judge Rodriguez acknowledged that. Well, but if you know about bulkheads, and it's not a hidden danger because the knowledge that unrated bulkheads won't give you protection isn't that significant if you know that rated bulkheads also won't give you protection unless the load is secured into the bulkhead. No, Your Honor. That is a very serious distinction that needs to be addressed. Labeling bulkheads is not addressed in the Federal Motor Carrier Safety Administration's... No, I'm not saying it's addressed in there. I'm saying it's a simple matter of logic reading the testimony that the experts are saying that a bulkhead, no matter what it's rated, will not offer protection unless the load is secured onto the bulkhead. Right? Wabash's experts have said that. Our experts disagree with that. Our experts, including Mr. Rubin and Dr. Vigilani, say that it's reasonable to believe that you will have cap protection if the load... I'm not saying reasonable what you believe. I'm talking about as a matter of science that no bulkhead will offer protection unless the load is secured on the bulkhead. No, that's inaccurate. Well, that's certainly all the expert testimony I've seen. For this particular case, they're saying that a DOT bulkhead, in terms of being half the weight of this particular subject load, if the load is back from at 18 inches, would not have stopped the particular load. But that, of course, is not the inquiry in a failure to warn case. It's not about the functional strength of the bulkhead. Well, you have your recollection. I have my recollection when I read the briefs and your red lights on, so we don't need to... As it has been for a while. I'll give you one minute to sum up. Thank you, Your Honor. Were it appropriate for a district court to allow in expert testimony in warnings cases covered by the New Jersey Products Liability Act on both human factors and warnings as well as the subject matter at issue, transportation, and nevertheless grant summary judgment after the DABRA proceedings occurred and were found in favor of the non-moving party, as was the case here, we have seen this a long time ago. The reason why we don't see these types of opinions and orders is because this is a jury inquiry. The heeding presumption, stated extremely explicitly by the Pullman Court, is all you get when you rebut the heeding presumption. What else is evidence of that? Well, Mr. Gangell had the load slightly back. That's something for the jury to consider. As a result, plaintiffs may not get the jury charge of directive verdict. But that is the only relief, not summary judgment. There is no support in the case law for this set of procedural history. All other cases have involved the disqualification of plaintiffs' experts, express admissions by plaintiffs that they would not have followed the warning, or express admissions by plaintiffs that it would not have made a difference. This case falls under none of those categories. As a result, and because of the necessity to have consistency between the double orders, allowing these experts to testify, recognizing that their testimony, both at deposition and in the form of the written reports, is evidence that is part of the record that must be viewed in the light most favorable to the non-moving party, we respectfully request, on behalf of the estate, that you reverse the district court's summary judgment. Thank you. Thank you to both counsel. We will take a matter under advisement and recess. Thank you.